IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CENTIMARK CORPORATION,<br>a Pennsylvania corporation,<br><br>Plaintiff,<br><br>v.<br><br>DONALD LAVINE, an individual<br><br>Defendant. | )<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT

CentiMark Corporation ("CentiMark") by and through its undersigned counsel files this

Complaint against its ex-employee Donald Lavine ("Lavine") who is working for a direct

competitor in violation of the express provisions of his employment agreement.  Lavine is now

actively soliciting, on behalf of this competitor, the very same CentiMark customers that were his

accounts while he was employed at CentiMark in the same territory he serviced while employed

by CentiMark.  His solicitations in breach of his employment agreement have already caused

CentiMark to lose to date (and CentiMark's competitor to gain) at least several large roofing

projects worth hundreds of thousands of dollars with the potential for CentiMark to lose more.

Lavine was a long-term employee of CentiMark who was hired with no experience in the

roofing industry.  By the time his employment ended, Lavine had become a highly-compensated

salesperson with many key contacts with CentiMark customers.  Before terminating his

employment with CentiMark, CentiMark discovered Lavine had improperly downloaded many

sensitive CentiMark documents.  It is CentiMark's belief that Lavine downloaded these

documents as part of his plan to unfairly compete with CentiMark.

## Parties

1.      CentiMark is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania located in Washington County.

2.      Lavine is an individual currently residing at 1232 Wildwood Lane, Canton, Michigan 48188.  At the time his employment with CentiMark ended, Lavine was assigned a sales territory consisting of the metro portions of Detroit, Michigan, including the counties of: Huron, Lapeer, Macomb, Monroe, Oakland, Saint Clair, Sanilac, Tuscola, Washtenaw and Wayne.

## Jurisdiction

3.      This Court has jurisdiction over this civil action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and is between citizens of different states.

4.      This Court has personal jurisdiction over Lavine because his employment agreement with CentiMark expressly provides that Lavine irrevocably submits to the personal jurisdiction of the courts sitting in Washington County, Pennsylvania in any action or proceeding arising out of or related to his employment agreement.  (Exhibit A).

5.      Additionally, this Court has personal jurisdiction over Lavine because he has the required minimum contacts with this forum to establish personal jurisdiction.  Lavine was employed by CentiMark which is headquartered in the Western District and received compensation from CentiMark's offices in Washington County.  Lavine has visited and corresponded regularly with CentiMark's offices in Washington County, and attended multi-day meetings there to discuss CentiMark confidential information including, but not limited to, selling strategies, vendor alliances and training.

6.      Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391, as the parties have agreed that this District has exclusive jurisdiction and venue.  (Exhibit A).

## CentiMark's Business

7.      CentiMark, founded in 1968 in Pittsburgh, has grown to become the largest commercial and industrial roofing contractor in the United States.

8.      CentiMark markets, sells, installs and services roofs and roofing systems throughout the United States and Canada primarily to commercial and industrial customers. CentiMark operates out of approximately 65 offices.

9.      The roofing industry is a highly competitive marketplace with many companies offering similar services vying for the same large, industrial and commercial roofing projects. Because of the size and importance of many of these projects, price and quality alone, while important factors, are not always the only variables that factor into contractor selection.

10.     CentiMark, like its competitors, focuses much of its sales efforts through a dedicated sales force where individual salespeople are assigned to specific territories or specific national accounts.

11.     CentiMark's salespeople, like others in the industry, develop sales in a variety of ways, but most importantly, through relationship building with the customers of CentiMark that reside in their territories or are assigned to them as national accounts.  These relationships, built over time, can often become the most important factor in roofing contractor selection, as customers come to rely upon the salesperson as their point of contact and the "face" of the company.

12.     CentiMark's salespeople inspect roofs, coordinate service calls for repairs, provide quotes and estimates for roofing or repair jobs, serve as the liaison to the customer for all roofing needs, and assist in the management of roofing projects when they are underway.  In general, CentiMark relies upon its salespeople to be the Company's contact with its customers for all of the customers' roofing needs.

13.     As such, CentiMark places a great deal of trust in its salespeople by entrusting them with a vital Company asset – the relationship between the Company and its customers.

14.     CentiMark also entrusts its salespeople with the confidential, proprietary business information of the Company regarding its customers, potential customers, pricing, products, services, customer complaints, profit margins, sales, sales volumes, material costs, key contacts with customers, unique vendor and supplier relationships, unique customer needs, warranty information, etc.

15.     CentiMark expends a great deal of money through the salaries, commissions and draws of its salespeople to build strong customer relationships between CentiMark and its customers.  It further supports its salespeople and their efforts to build strong customer relationships on behalf of the Company by providing an inside sales force, a dedicated service department that provides prompt, effective service, responsive operations people, high-quality roofing products and roofing systems that are consistently improved and updated, administrative support, reimbursement of business-related expenses, a monthly car allowance and the strength and recognition of the CentiMark name.

### CentiMark's Employment of Lavine

16.     Shortly after he signed an employment agreement with CentiMark on November 12, 1998, Lavine was hired to start work on November 16, 1998 as a Technical Representative making an annual salary of $28,000.

17.     The employment agreement was required because Lavine's position and career path at CentiMark would expose him to CentiMark's confidential, proprietary business information as well as give him access to CentiMark's customers.

18.     Lavine had no experience in the roofing industry at the time of hire.

19.     During his employment, Lavine learned the roofing industry through training and support provided by CentiMark.

20.     CentiMark promoted Lavine several times.  On December 1, 2003, CentiMark promoted Lavine from Associate Project Manager to Senior Project Manager.

21.     As Senior Project Manager, Lavine's primary responsibility was to sell roofs, roofing systems, and repairs/service in his territory for which he received commission payments based upon a floating scale which was a function of the profitability of the project.

**a.      Employment Agreement terms clearly highlighted.**

22.     Prior to his hire on November 16, 1998, so that there could be absolutely no confusion as to what obligations Lavine would be agreeing to under the employment agreement, CentiMark provided Lavine with an Employment Agreement ("Employment Agreement") which contained a simple "IMPORTANT NOTICE" as a cover page.

23.     The IMPORTANT NOTICE provided:

> AS A PENDING EMPLOYEE, CENTIMARK HAS PRESENTED YOU
> WITH THE ATTACHED EMPLOYMENT AGREEMENT.  THIS
> AGREEMENT CONTAINS SPECIFIC PROVISIONS WHICH YOU, AS
> A CANDIDATE FOR EMPLOYMENT, SHOULD THOROUGHLY

> REVIEW WITH YOUR ATTORNEY, ACCOUNTANT OR OTHER
> ADVISOR OF YOUR CHOICE, PRIOR TO SIGNING.  SINCE THIS
> AGREEMENT IS A BINDING AND LEGAL CONTRACT, IT IS
> STRONGLY RECOMMENDED THAT YOU REVIEW ITS
> CONTENTS WITH YOUR ATTORNEY.  YOUR FULL
> UNDERSTANDING AND VOLUNTARY ACCEPTANCE OF THE
> TERMS OF THE AGREEMENT IS VERY IMPORTANT.

(Exhibit A).

24.     The IMPORTANT NOTICE informed Lavine, in highlighted format, of some of the important provisions in the Employment Agreement that he was being given for consideration including:

- the post employment restrictions on competition,

- his requirement to notify CentiMark of his future employer,

- CentiMark's right to obtain injunctive relief to enforce the agreement,

- that Pennsylvania law would govern any dispute about the Employment Agreement, and

- that any legal actions brought to enforce the Employment Agreement would be in Washington County, Pennsylvania.

(Exhibit A).

**b.      Lavine signs the Employment Agreement.**

25.     Lavine initialed the IMPORTANT NOTICE in five places acknowledging each of the highlighted sections and signed the IMPORTANT NOTICE under his acknowledgement that, "I HAVE NOT BEEN THREATENED OR COERCED IN ANY WAY AND AGREE THAT I HAVE BEEN ADVISED TO SEEK LEGAL COUNSEL."  (Exhibit A).

26.     Lavine accepted the offer of employment, acknowledged the IMPORTANT NOTICE, and signed the Employment Agreement on November 12, 1998, after initialing every page of the agreement.  (Exhibit A).

c.    **The Employment Agreement's terms.**

27.    In the Employment Agreement, Lavine acknowledged that it was his intent to be legally bound by the document, that it was necessary because of the access to trade secrets and the confidential proprietary information of the Company that he would obtain as a result of working for CentiMark, and that he had received valuable consideration in exchange for the Employment Agreement.  (Exhibit A).

28.    In the Employment Agreement, Lavine agreed to be bound by certain post-employment obligations, including a non-disclosure of confidential information provision, a non-compete provision, and a non-solicitation of customer provision.  (Exhibit A).

29.    Specifically, Lavine agreed that he would not:

> … engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, or otherwise, alone in or in association with any other person, corporation or other entity, in any Competing Business in a Restricted Area for two (2) years from the date of termination of this Agreement.

> a.    For the purpose of this Agreement, the term, "Competing Business" shall mean:

> > (i)    any person, business, enterprise or other entity which sells or attempts to sell any products or services, or other combination thereof, which are the same as, or similar to, the products and services sold by CENTIMARK at any time, and from time to time, during the last three (3) years prior to the termination of Employee's employment hereunder or subsequent thereto during the period of time in which Employee is restricted from competing with CentiMark pursuant to the provisions of this Agreement.

> > (ii)    any person, business, enterprise, or other entity which solicits, trades with, advises, calls upon or otherwise does, or attempts to do, direct or indirectly, a business with any clients, customers or accounts of CENTIMARK, its successors, assigns, subsidiaries or affiliates, that have done business with CENTIMARK at any time during the period of Employee's employment hereunder.

b.    For the purpose of this Agreement, a Restricted Area shall mean that area within 100 air miles of the borders of any Centimark District in which Employee has operated as an Employee of Centimark.  If the Employee was a Sales Manager, District Manager, Regional Manager, Corporate Officer, member of the National Account Division, or any other Employee who dealt with National Account customers, then the Restrictive Area shall include the United States and the Provinces of Ontario and Quebec, Canada.

c.    The prohibition on doing business with customers and suppliers of CENTIMARK, as described in Paragraph 4.05 shall be limited to prohibition from engaging in such business as would constitute Employee's engaging in a competitive business, as described in Paragraph 4.05(a); however, it shall not prohibit the Employee, after termination of employment from doing business with such customers and suppliers while engaged in, both for the promotion and purpose of, a Non-Competing Business.

(Exhibit A).

30.    Lavine also promised in the Employment Agreement that:

… during his employment with CENTIMARK he/she will not, directly or indirectly, solicit the trade of, or trade with, any customer, prospective customer or supplier of CENTIMARK for any business purpose other than for the benefit of CENTIMARK.  Employee further agrees that for two (2) years following termination of his employment with CENTIMARK, including, without limitation, termination by CENTIMARK for cause or without cause, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers or suppliers, or prospective customers or suppliers of CENTIMARK.  For the purpose of this Agreement, the term "Prospective Customer" shall mean any customer, person or other business entity, contacted by CENTIMARK during the restrictive period mentioned in this Agreement.

The prohibition on solicitation of customers and suppliers of CENTIMARK, as described in Paragraph 4.06 (a), shall be limited to such solicitation which would constitute Employee's engaging in a competitive business as described in Paragraph 4.05; however, it shall not prohibit Employee, after termination of employment from soliciting the trade of such customers and suppliers while engaged in, or for the promotion and purpose of, a Non-Competing Business.

(Exhibit A).

31.    Lavine further promised in the Employment Agreement that upon leaving

CentiMark, he would:

> immediately notify Centimark of the name, address and nature of the
> business of his new Employer, or, if self-employed, the name, address and
> nature of his new business or advise Centimark of continued
> unemployment.  Employee shall provide such notification immediately
> upon securing new employment, or commencing a business, and continue
> to provide such notification if such employment status should change.
> Employee's obligation to provide such notice shall continue for two (2)
> years after the date of the Employee's termination of employment with
> Centimark.

(Exhibit A).

32.    Lavine also agreed that Pennsylvania law would govern the Employment

Agreement, and that he irrevocably submitted to the personal jurisdiction of the courts sitting in

Washington County, Pennsylvania; irrevocably waived any objection to venue brought in those

courts and acknowledged that "jurisdiction and venue of all causes of action arising out of, or

related to, this Employment Agreement shall be exclusively vested in the state or federal courts

in Washington County, Pennsylvania."  (Exhibit A).

33.    Lavine received consideration for signing the Employment Agreement in the form

of an offer of employment and CentiMark hiring him.  Agreeing to the terms of the Employment

Agreement was consideration in exchange for CentiMark hiring Lavine.

34.    On June 27, 2005, Lavine acknowledged receiving a memorandum from

CentiMark regarding the Employment Agreement.  (Exhibit B).  The memorandum reminded

Lavine of the Employment Agreement and his obligations should his employment with

CentiMark terminate.  Lavine signed the memorandum.

**d.     Lavine gains knowledge about CentiMark's business.**

35.     As a Senior Project Manager, Lavine had the full support of CentiMark behind him including inside sales help, administrative support, full-time service and operations employees, which all facilitated his ability to establish strong relationships with CentiMark's customers and prospective customers.

36.     Additionally, Lavine was well-compensated for his efforts in establishing customer relationships and generating sales on behalf of CentiMark earning $113,485.90 for a partial year of employment in 2010.  In 2006, Lavine earned $220,975.71.

37.     In his nearly ten years as a Manager for CentiMark, Lavine developed new customer relationships and continued to build on customer relationships – all on behalf of CentiMark.

38.     Many of the customers in his territory became large, important, repeat customers of CentiMark generating millions of dollars of revenue on an annual basis, thus enabling Lavine to develop long-standing relationships with these important customers.

39.     By way of example, Lavine established strong customer relationships on behalf of CentiMark with customers like E&E Manufacturing Company ("E&E") and L&W Engineering ("L&W").

40.     In addition to developing relationships with customers through his work at CentiMark, Lavine also learned CentiMark's pricing structures for current customers with future business needs.

41.     Further, in working with CentiMark's customers, Lavine learned of their future roofing needs, their budgets for such projects and the schedules for such projects.

42.     The relationship that Lavine has established with long-standing, repeat customers like E&E and L&W (all with the support and through the expense of CentiMark) is a business interest that is valuable to CentiMark, which it has carefully protected through its Employment Agreement with Lavine.

43.     Such relationships, initiated, created, cultivated, nurtured and solidified at great expense to CentiMark through its salespeople like Lavine are a legitimate business interest worthy of protection through post-employment restrictions upon its employees.

44.     Such relationships necessarily expose salespeople like Lavine to the confidential, proprietary business information of CentiMark and its customers as projects are inspected, specified, quoted, installed, repaired and/or serviced.  In addition to developing the customer relationships themselves, Lavine also gained valuable insight into CentiMark's customers roofing needs, projections and timing of future projects, unique specifications, negotiating strategies, points of contact, budgets, and decision makers.

45.     Additionally, to serve as a CentiMark Project Manager, Lavine was exposed to the confidential, proprietary business information of CentiMark including product information not publicly available, including but not limited to, warranty lists, profit margins, pricing, unique problems or difficulties faced with customers, and/or projects that could be exploited by a competitor, customer contact information, sales lists, sales volumes of customers, etc.

46.     Such customer relationships and confidential, proprietary business information, if not entitled to protection, can and will be exploited by other roofing contractors offering the same or similar products and services in the same territory who will gain an unfair competitive advantage over CentiMark by simply acquiring CentiMark's valuable business assets without

incurring the costs and expenses necessary to establish such relationships or information themselves through years of trial and effort.

47.     For example, Lavine developed personal and business relationships with Gene Goins of L&W and Bryan Cody of E&E. As an employee of CentiMark, Lavine worked on proposals and projects for these two clients and had direct contact with both of them in 2009 and 2010. As part of this process, and while being paid by CentiMark, Lavine learned of these customers' roofing needs, schedule of projects, and budgets.

48.     Through Lavine's relationships with L&W and E&E, and CentiMark's proposals, CentiMark was awarded jobs by both L&W and E&E in 2010. Lavine worked on the CentiMark proposals for both customers in 2010.

49.     Through developing the bids for both L&W and E&E, Lavine became aware of CentiMark's pricing for the projects for both companies.

50.     Also by developing these customer relationships, Lavine learned from both L&W and E&E that they would have other roofing projects in 2011 and what their budgets and schedules would be. CentiMark planned to perform the work on both projects.

51.     Lavine was aware that both L&W and E&E would have additional projects in 2011 through his work with CentiMark.

**e.     Lavine's Performance.**

52.     Lavine had been a successful salesperson with CentiMark, however, by 2009 his sales had begun to slip. In fact, in 2005 and 2006 Lavine had more than $5 million in sales in each year, as compared to 2009 when he sold $3.8 million and 2010 when he was on track to sell approximately $3 million.

53.     In March 2010, Robert Rudzik ("Rudzik"), Executive Vice President North and Canada operations, met with Lavine to find out what was bothering Lavine and to see what he could do to get the "old Lavine" back – the one who broke sales records in 2005 and 2006. Their discussion focused on Lavine's decline in sales, lack of teamwork, and secretive attitude about customer relationships. At one point during the meeting, Rudzik asked Lavine what he could do to help him. Lavine responded that he did not need assistance. Rudzik told Lavine that CentiMark would support him and give him assistance if he needed it to turn around his performance.

**f.     CentiMark discovers Lavine had misappropriated confidential and proprietary information.**

54.     In or about September 2010, CentiMark discovered that Lavine had been emailing CentiMark's electronically stored information in large quantities to his personal email address – donlavine@sbcglobal.net.

55.     Lavine had sent to his personal email the following items: the Salaried and Clerical Employees Manual, a list of all warranty customers CentiMark had in Michigan, pre-job packages, CentiMark's Safety and Loss Manual, and other communications and proposals between CentiMark and its customers, among other items.

56.     Lavine emailed these documents to his personal email on or about August 17, August 31, September 10 and September 27, 2010.

57.     CentiMark was suspicious as to why Lavine would send these proprietary documents to his personal email address as there appeared to be no legitimate business reason to do so. Many of these documents were marked as "confidential".

58.     The documents Lavine sent to his home would be valuable in setting up a competing business with CentiMark.

59.     In particular, the list of warranties was a valuable document.  It was an 88-page document containing the name of every customer of CentiMark in Michigan and the date when the warranty expired on their roof.  This document would be very valuable for a competitor of CentiMark as information compiled in this fashion is not available to the public.

60.     Also, the pre-job packages describe in detail how CentiMark prices its bid.  A competitor of CentiMark would be able to use the pre-job packages to its advantage in out bidding CentiMark on a job.

61.     The Salaried and Clerical Employees Manual and CentiMark's Safety and Loss Manual would be valuable to someone starting a competing business.

62.     Because Lavine had made comments regarding his desire to set up a competing business, his downloading of these documents further raised CentiMark's suspicions.

63.     Because of the extremely sensitive nature of the documents Lavine had sent, Rudzik confronted Lavine to ask why he sent these documents to his personal email address.

64.     Lavine responded that he needed the documents to enable him to work from home; however, that proffered excuse made no sense in light of the type of documents he had downloaded.

g.     **CentiMark demands Lavine return the proprietary documents.**

65.     In the meeting with Lavine, Rudzik demanded that Lavine return the documents he had emailed.

66.     Lavine told Rudzik that he would, however, because many of the documents were electronically stored, there was no way CentiMark could be certain that electronic documents did not remain in Lavine's possession.

**h.     CentiMark discharges Lavine.**

67.     Because CentiMark determined that Lavine had improperly downloaded proprietary and confidential documents to his personal email address and because Lavine's performance had slipped, CentiMark decided to terminate Lavine on October 7, 2010.

68.     On November 30, 2010, CentiMark sent a letter to Lavine regarding the confidential information Lavine had downloaded to his personal email address prior to his discharge.  (Exhibit C).

69.     In the letter, CentiMark reminded Lavine of his Employment Agreement and his obligation to return all confidential information upon termination of employment.  CentiMark's letter also asked Lavine to notify CentiMark if he had gained other employment.

70.     On December 14, 2010, Lavine signed an acknowledgement that he had the opportunity to review his Employment Agreement carefully  ("December 2010 Acknowledgement").  Lavine acknowledged he understood his obligation to return confidential information, and that he had a "continuing obligation under Article 4.08 of [his] Employment Agreement to notify CentiMark of new employment."

71.     Lavine returned copies of some of the documents he had taken along with roof samples.

72.     Although he confirmed his obligation to do so, Lavine has never notified CentiMark of his new employment.

**i.     CentiMark discovers Lavine is soliciting CentiMark customers for a competitor.**

73.    Despite his contractual obligations and the December 2010 Acknowledgement, Lavine has not provided CentiMark with any information about his employment after his employment with CentiMark ended.

74.    Not long after four CentiMark laborers suddenly resigned in April 2011 to go to work for a company affiliated with Great Lakes Roofing, Inc. ("Great Lakes"), CentiMark became aware that Lavine was selling roofing projects for Great Lakes.

75.    Great Lakes is a roofing company headquartered in Rochester Hills, Michigan (approximately 40 miles from CentiMark's Michigan office), that offers the same or similar products as CentiMark in the same territory serviced by CentiMark's Michigan office.

76.    Great Lakes competes directly with CentiMark in Lavine's former CentiMark territory for the exact same type of industrial and commercial customers serviced by Centimark for roofing products and services.

77.    CentiMark customers have informed CentiMark that Lavine is contacting them to solicit them for roofing projects on behalf of Great Lakes.

78.    Several customers who would have otherwise selected CentiMark to complete substantial roofing projects in 2011 have decided not to use CentiMark, but to use Great Lakes instead.  For example, both L &W and E&E have informed CentiMark that they are using Great Lakes, despite using CentiMark last year when Lavine was employed there.

79.    Upon information and belief, Lavine's customer relationships with these customers (established while he was an employee of CentiMark) is a key factor in these customers entertaining proposals from and awarding jobs to Great Lakes.

80.    L&W had two significant roofing projects in 2011.

81.     CentiMark customer L&W, informed CentiMark that it had chosen to stop doing business with CentiMark on two new roofing projects selecting instead to assign the projects to Great Lakes.

82.     Both of the L&W projects were located in Wayne County, which was part of Lavine's territory when he worked for CentiMark.

83.     CentiMark customer E&E, informed CentiMark that it had chosen to stop doing business with CentiMark on a new roofing project selecting instead to assign the project to Great Lakes.  The customer contact at E&E specifically identified Don Lavine as the person that had solicited E&E on behalf of Great Lakes.  The customer contact at E&E stated that because Lavine worked for CentiMark and knew the cost quoted by CentiMark, he was able to provide a very competitive bid on behalf of Great Lakes.

84.     The E&E project was located in Wayne County, which was part of Lavine's territory when he worked for CentiMark.

85.     Upon information and belief, Lavine is now seeking revenge for his discharge in October 2010 and actively soliciting CentiMark customers in his Restricted Territory on behalf of Great Lakes in direct violation of the Employment Agreement.

**j.     CentiMark is entitled to preliminary and injunctive relief.**

86.     CentiMark is likely to succeed on the merits of this case because it has a valid, enforceable agreement with Lavine, it has legitimate business interests to protect, and Lavine's breach is open, blatant and obvious.

87.     CentiMark's customer relationships, goodwill, market share, business opportunities, competitive advantage, confidential information, and relations with its remaining employees will be irreparably harmed if a preliminary and permanent injunction is not entered.

88.   CentiMark will suffer far greater harm if preliminary and permanent injunction is not granted than Lavine will suffer if one is granted. Lavine will suffer no harm – but simply be ordered to honor the promises he made.

89.   Granting a preliminary injunction would serve the public interest.

## Count I
## Breach of Contract

90.   Plaintiff incorporates by reference Paragraphs 1 through 89 of the Complaint as if the same were set forth in full herein in their entirety.

91.   Lavine's Employment Agreement that is attached to this Complaint at Exhibit A is a valid, enforceable contract supported by adequate consideration that was offered to and voluntarily and knowingly accepted by Lavine.

92.   By becoming employed by Great Lakes, by soliciting CentiMark's customers on behalf of Great Lakes, by disclosing the confidential, proprietary business information of CentiMark to Great Lakes and on behalf of Great Lakes, by competing with CentiMark within the Restricted Territory and for failing to disclose his employment relationship with Great Lakes, Lavine has breached and continues to breach his Employment Agreement.

93.   The post-employment restrictions contained in Lavine's Employment Agreement are reasonably limited to protect CentiMark's legitimate business interests.

94.   Lavine's breach has been knowing, willful, intentional and unprivileged, and has caused and will continue to cause immediate, irreparable harm to CentiMark.

WHEREFORE, CentiMark respectfully requests this Court enter an order immediately enjoining Lavine, preliminarily and then permanently, for a period of a full two years from the date of the order, pursuant to the tolling provisions of paragraph 7.02 of his Employment

Agreement, (a) from soliciting CentiMark's customers or prospective customers pursuant to paragraph 4.06 of his Employment Agreement; (b) from illegally competing with CentiMark in violation of paragraph 4.05 of his Employment Agreement; (c) from remaining in the employ of Great Lakes pursuant to 4.05 and 4.06 of his Employment Agreement; (d) from failing to keep CentiMark informed of his employment relationship pursuant to paragraph 4.08 of his Employment Agreement; (e) from misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of CentiMark pursuant to paragraph 4.01 of his Employment Agreement; and (f) from possessing any confidential information, trade secrets or proprietary information of CentiMark's and ordering any such materials be immediately returned to CentiMark pursuant to paragraph 4.04 of his Employment Agreement.  CentiMark also respectfully requests this Court grant CentiMark compensatory damages including its reimbursement of attorney's fees pursuant to paragraph 5.03 of Lavine's Employment Agreement and any other relief this Court deems appropriate.

### Count II
### Violation of the Pennsylvania Uniform Trade Secrets Act

95.      CentiMark incorporates by reference Paragraphs 1 through 94 of the Complaint as if the same were set forth in full herein in their entirety.

96.      Lavine is a "person" as defined by the Pennsylvania Uniform Trade Secrets Act ("PUTSA") codified at 12 Pa. Cons. Stat. Ann. § 5301 *et seq.*

97.      CentiMark possesses valuable trade secrets and confidential and proprietary business information relating to the roofing business, its operations, its customers, its employees, its financial data and its products.

98.     CentiMark has spent significant time and money developing its trade secrets and confidential and proprietary business information and has taken steps to protect this information from disclosure including requiring employees who have access to this type of information execute employment agreements with confidentiality restrictions.

99.     Disclosure of this type of information to CentiMark's competitors, such as Great Lakes, would undermine CentiMark's competitive position in the marketplace.

100.     Lavine had access to the trade secrets and confidential and proprietary business information of CentiMark following his hire in November 1998.

101.     Since leaving CentiMark, upon information and belief, Lavine has misappropriated, misused and disclosed such information, and continues to do so, on behalf of Great Lakes, a competitor of CentiMark's.

102.     Disclosure of this type of information to CentiMark's competitors, like Great Lakes, would undermine CentiMark's competitive position in the marketplace.

103.     Lavine's conduct is willful, intentional, malicious, unprivileged, and in bad faith and has caused (and will continue to cause) immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

WHEREFORE, pursuant to Sections 5303-5305 of the PUTSA, CentiMark respectfully requests this Court enter an Order granting injunctive relief, double damages, affirmative relief to ensure the protection of CentiMark's trade secrets, reasonable attorneys' fees, exemplary damages, and/or other appropriate relief.

**Count III**
**Tortious Interference with Contract and with Prospective Business Relations**

104.    Plaintiff incorporates by reference Paragraphs 1 through 103 of the Complaint as if the same were set forth in full herein in their entirety.

105.    CentiMark currently has a number of contractual relations with customers that are covered under the non-solicitation/non-competition provisions of Lavine's Employment Agreement.

106.    Because of the nature of the industry and the strong customer relationships that have been developed over time, CentiMark has a prospective contractual relationship with a number of customers and prospective customers that are covered by the non-competition/non-solicitation provisions of Lavine's Employment Agreement.

107.    Lavine has no privilege or justification to interfere with the contractual or perspective contractual relationships that CentiMark has with its customers or prospective customers.

108.    Lavine, through his intentional acts, has intentionally interfered with the contractual and/or prospective contractual relationships that CentiMark has with its customers and prospective customers.

109.    Lavine's actions have caused and will continue to cause harm to CentiMark by damaging its contractual and prospective contractual relationships with its customers, harming its goodwill, disclosing its trade secret and confidential, proprietary business information and causing it to suffer other compensatory damages.

WHEREFORE, CentiMark respectfully requests this Court enter an order immediately enjoining Lavine, preliminarily and then permanently, for a period of a full two years from the

date of the order, pursuant to the tolling provisions of paragraph 7.02 of his Employment Agreement, (a) from soliciting CentiMark's customers or prospective customers pursuant to paragraph 4.06 of his Employment Agreement; (b) from illegally competing with CentiMark in violation of paragraph 4.05 of his Employment Agreement; (c) from remaining in the employ of Great Lakes pursuant to 4.05 and 4.06 of his Employment Agreement; (d) from failing to keep CentiMark informed of his employment relationship pursuant to paragraph 4.08 of his Employment Agreement; (e) from misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of CentiMark pursuant to paragraph 4.01 of his Employment Agreement; and (f) from possessing any confidential information, trade secrets or proprietary information of CentiMark's and ordering any such materials be immediately returned to CentiMark pursuant to paragraph 4.04 of his Employment Agreement.  CentiMark also respectfully requests this Court grant CentiMark compensatory damages including its reimbursement of attorney's fees pursuant to paragraph 5.03 of Lavine's Employment Agreement and any other relief this Court deems appropriate.

### Count IV
### Unfair Competition

110.    Plaintiff incorporates by reference Paragraphs 1 through 109 of the Complaint as if the same were set forth in full herein in their entirety.

111.    Lavine, by engaging in the conduct described above, has engaged in unfair competition with CentiMark.  That conduct has caused and will continue to cause damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships, and valuable business interests.

112.    Lavine's conduct has been and continues to be willful, intentional and unprivileged, and has caused and will continue to cause CentiMark to suffer immediate, irreparable harm.

113.    Lavine's conduct, as described above, is contrary to honest, industrial and commercial practices.

WHEREFORE, CentiMark respectfully requests this Court enter an order immediately enjoining Lavine, preliminarily and then permanently, for a period of a full two years from the date of the order, pursuant to the tolling provisions of paragraph 7.02 of his Employment Agreement, (a) from soliciting CentiMark's customers or prospective customers pursuant to paragraph 4.06 of his Employment Agreement; (b) from illegally competing with CentiMark in violation of paragraph 4.05 of his Employment Agreement; (c) from remaining in the employ of Great Lakes pursuant to 4.05 and 4.06 of his Employment Agreement; (d) from failing to keep CentiMark informed of his employment relationship pursuant to paragraph 4.08 of his Employment Agreement; (e) from misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of CentiMark pursuant to paragraph 4.01 of his Employment Agreement; and (f) from possessing any confidential information, trade secrets or proprietary information of CentiMark's and ordering any such materials be immediately returned to CentiMark pursuant to paragraph 4.04 of his Employment Agreement. CentiMark also respectfully requests this Court grant CentiMark compensatory damages including its reimbursement of attorney's fees pursuant to paragraph 5.03 of Lavine's Employment Agreement and any other relief this Court deems appropriate.

## Count V
## <u>Breach of Fiduciary Duty/Duty of Loyalty</u>

114.    Plaintiff incorporates by reference Paragraphs 1 through 113 of the Complaint as if the same were set forth in full herein in their entirety.

115.    Lavine occupied a position of trust and confidence while employed by CentiMark.

116.    As such, Lavine owed CentiMark fiduciary duties and a duty of loyalty.

117.    Those duties existed while Lavine was employed by CentiMark.

118.    Lavine's conduct, as described above, constitutes a breach and continuing breach of his fiduciary duties and duty of loyalty.

119.    Lavine's conduct has been and continues to be willful, intentional and unprivileged and has caused and will continue to cause CentiMark to suffer immediate, irreparable harm.

WHEREFORE, CentiMark respectfully requests this Court enter an order immediately enjoining Lavine, preliminarily and then permanently, for a period of a full two years from the date of the order, pursuant to the tolling provisions of paragraph 7.02 of his Employment Agreement, (a) from soliciting CentiMark's customers or prospective customers pursuant to paragraph 4.06 of his Employment Agreement; (b) from illegally competing with CentiMark in violation of paragraph 4.05 of his Employment Agreement; (c) from remaining in the employ of Great Lakes pursuant to 4.05 and 4.06 of his Employment Agreement; (d) from failing to keep CentiMark informed of his employment relationship pursuant to paragraph 4.08 of his Employment Agreement; (e) from misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of CentiMark pursuant to paragraph 4.01 of his Employment Agreement; and (f) from possessing

any confidential information, trade secrets or proprietary information of CentiMark's and

ordering any such materials be immediately returned to CentiMark pursuant to paragraph 4.04 of

his Employment Agreement.  CentiMark also respectfully requests this Court grant CentiMark

compensatory damages including its reimbursement of attorney's fees pursuant to paragraph 5.03

of Lavine's Employment Agreement and any other relief this Court deems appropriate.

Dated:  June 8, 2011                              Respectfully submitted,

                                                 /s/ Gregory A. Miller
                                                 Gregory A. Miller (PA 69807)
                                                 gregory.miller@bipc.com
                                                 Brian D. Balonick (PA 89272)
                                                 brian.balonick@bipc.com
                                                 Erin J. McLaughlin (PA 202044)
                                                 erin.mclaughlin@bipc.com
                                                 BUCHANAN INGERSOLL & ROONEY PC
                                                 One Oxford Centre
                                                 301 Grant Street, 20th Floor
                                                 Pittsburgh, PA  15219
                                                 Phone:  412-562-8800
                                                 Fax:  412-562-1041

                                                 Attorneys for Plaintiff CentiMark Corporation

## VERIFICATION

I, Robert Rudzik, verify that I am the Executive Vice President of North and Canada Operations of CentiMark Corporation, and am authorized to execute this Verification in its behalf. Having read the foregoing **Verified Complaint,** I verify that the statements therein are based on information that I have gathered as well as other agents of CentiMark Corporation. The language of the pleading is that of counsel and not of the signer. I verify that I have read the foregoing **Verified Complaint** and that it is true and correct to the best of my knowledge, information and belief.

I understand that this Verification is made subject to the penalties relating to unsworn falsification to authorities, 28 U.S.C. § 1746.

Dated: June 7, 2011

#6014502-v5